To: Clerk of the Western District of Washington
    1717 Pacific Ave, Room 3100
    Tacoma Wa 98402

From:DeAngelo Green #310589#
    1313 N 13th Ave
    Wsahington State Penitentiary
    Walla Walla Wash 99362


Dear Clerk,


I am sending you my civil complain--my Declaration-- some
exhibits which much more will be sent in the future and a summon

For my payment in $400 will be in your **(hands)** by the 4th of
October 2017. As you know we as prisoners have to wait until
money is sent off.. Bare with me you will be receiving $400
for this complaint.




                     DeAngelo Green  Plaintiff

Date  10/27

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

DEANGELO A. GREEN
_____
(Name of Plaintiff)

3:17-cv-5898-RBL-DWC

CIVIL RIGHTS COMPLAINT
BY A PRISONER UNDER 42
U.S.C. § 1983

vs.

MARGARET Gilbert
michAEl GlEASON
John DoE 1-10 And
JAnE DoE 1-4
_____
(Names of Defendant(s))

**I. Previous Lawsuits:**

　　A. Have you brought any other lawsuits in any federal court in the United States while a prisoner?:

　　　　☐ Yes　　☑ No

　　B. If your answer to A is yes, how many?:_____. Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.)

　　1. Parties to this previous lawsuit:

　　　　Plaintiff: _1_____

　　　　Defendants:_____

　　2. Court (give name of District):_____

　　3. Docket Number: _____

2

4. Name of judge to whom case was assigned: _____

5. Disposition (For example: Was the case dismissed as frivolous or for failure to state a claim? Was it appealed? Is it still pending?):

_____

6. Approximate date of filing lawsuit: _____

7. Approximate date of disposition: _____

**II. Place of Present Confinement:** WAshington State Penitentiary Victor Unit (MED)

A. Is there a prisoner grievance procedure available at this institution?   ☑ Yes   ☐ No

B. Have you filed any grievances concerning the *facts* relating to this complaint?
                                                                    ☑ Yes   ☐ No

    If your answer is NO, explain why not:

_____

_____

C. Is the grievance process completed?                          ☑ Yes   ☐ No

      **If your answer is YES, ATTACH A COPY OF THE FINAL GRIEVANCE RESOLUTION for any grievance concerning facts relating to this case.**

**III. Parties to this Complaint**

A. Name of Plaintiff: DEAngElO A. GREEN   Inmate No.: 310589

Address: 1313 N 13th Ave, WAllA WAllA, WASh 99362

(In Item B below, place the full name of the defendant, his/her official position, and his/her place of employment. Use item C for the names, positions and places of employment of any additional defendants. Attach additional sheets if necessary.)

B. Defendant: MARgAREt Gilbert   Official Position: SuPERintendAnt

Place of employment: StAfford CREEK CORRECTIONAl CENTER

C. Additional defendants MichAEL GlEASON ChiEF I&I, SCCC JOhN DOE And JANE DoE, STAFFS in SCCC

_____

_____

**IV. Statement of Claim**

(State here as briefly as possible the <u>facts</u> of your case. Describe how each defendant is involved, including dates, places, and other persons involved. <u>Do not give any legal arguments or cite any cases or statutes.</u> If you allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets if necessary.)

SEE   Attachments

**V. Relief**

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

SEE Attachments

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _27_ day of _Oct_ 20 _17_.

_____
D'Angelo Greene
(Signature of Plaintiff)

ii

UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF WASHINGTON

DeAngelo Green,
      Plaintiff,

      -V-

Margaret Gilbert,Superintendent,SCCC
(Stafford Creek Correctional Center)
Michael Gleason Chief I&I,SCCC
John Doe 1-10, and Jane Doe 1-4,SCCC
      Defendants,
      JURY TRIAL DEMANDED

3:17-cv-5898-RBL-DWC

Civil Action_____

**COMPLAINT**

### I.JURISDICTION & VENUE

1.    This is a civil action authorized by 42 U.S.C. Section 1983
to redress the deprivation, under color of state law,of rights secured
by the Constitution of the United States. The court has jurisdiction
under 28 U.S.C. Section 1331 and 1343(a) (3). Plaintiff Green seeks
declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202.
Plaintiff Green's claims for injunctive relief are authorized by
28 U.S.C. Section 2283 & 2284 and Rule 65 of the Federal Rules of
Civil Procedure.


@.    The western District of Wasington is an appropriate venue under
28 U.S.C. section 1391(b) (2) because it is where the events giving
rise to this claim occurred.


### II.PLAINTIFFS

3.    Plaintiff DeAngelo Green, is and was at all times mentioned
herein a prisoner of the State of Washington in the custody of the
Stafford Creek Correctional Center when those events happened to
the plaintiff. He is currently confined at Washington State
Penitentiary (medium in Victor Unit) in the State of Washington..

6

### III.DEFENDANTS

4.   Defendant Margaret Gilbert is the superintendent of
Stafford Creek Correctional Center in the State of Washington.
She is legally responsible for the operation of Stafford
Creek Correctional Center and for the safety of all the
inmates of that prison.

5.   Defendant Michael Gleason is the chief investigator
in Stafford Creek Correctional Center. Defendant Michael
Gleason have the resources to solving any issue at S.C.C.C.
He is the master with the safety at S.C.C.C. who at all times
mentioned in this complaint held an important position and
was assigned to deal with all levels of danger at S.C.C.C.

6.   Defendants John and Jane Doe 1-10 at all times material
hereto were staffs of Stafford Creek Correctional Center,
State of Washington. Defendants John and Jane 1-10 are or
were employed by D.O.C. All acts, practices and omissions
on the part of Defendants John and Jane Doe 1-10 were done
as part of their employment (working in the S.C.C.C. kitchen)
and working  in S.C.C.C. were done on behalf of themselves.

### IV.Facts

7.   Plaintiff DeAngelo Green is an Out of State offender
currently serving a sentence within the state of Washington
for crimes committed in Washington D.C.

8.   Except for a span of time between 2013,and 2014, in
which Plaintiff DeAngelo Green was remanded to Federal Custody
,he was, at all times relevant to this case, confined within
the Washington State Department of Corrections.

9.   While serving his time in Stafford Creek Correctional
Center, Aberdeen, Washington in 2011, DeAngelo Green was
befriended by offender Anthony Forshaw.. For a time, the
plaintiff DeAngelo Green mentored Anthony Forshaw.

10.  Mr. Forshaw's dishonesty, recalcitrant nature, and
his willingness to disseminate rumors caused DeAngelo
Green to distance himself from Mr. Forshaw; causing Mr.
Forshaw to then level false-charges against DeAngelo Green.
Anthony Forshaw"s allegations against DeAngelo Green were
subsequently ruled unsubstantiated by SCCC staff investigators
See supporting documentation as ~~exhibit one~~

11.    Regardless of the findings listed under exhibit ████,
Plaintiff DeAngelo Green was demoted one custody level, and
remanded to a Closed custody facility for a period of one
year. See exhibit ████

12.    In 2014, Plaintiff DeAneglo Green returned to Stafford
Creek Correctional Center again, where he was assigned to
housing unit H-2, and placed into a cell occupied by a known
confidential-informant. Plaintiff DeAngelo Green made numerous
attempts to move to another cell, but was thwarted by the
unit supervisor.

13. Plaintiff Green was abruptly reassigned to housing unit
G-unit of S.C.C.C. in 2014. Shortly after moving to G-unit,
Plaintiff DeAneglo Green met and was befriend by offender
Mattrew Holt 341901   , a member of the Gangster Disciples street
gang.

14. Plaintiff DeAngelo Green soon discovered that Mr. Holt
was a closeted homosexual, and that Mr. Holt had filed numerous
complaints of sexual misconduct against fellow offenders.
Mattrew Holt began aggressively pursuing plaintiff DeAngelo
Green in the hopes of enticing Mr. Green into a homosexual
relationship.

15.    Plaintiff DeAngelo Green spurned Mattrew Holt's attempts
to lure him into a homosexual encounter, thus provoking Mr.
Holt to seek vengeance upon DeAngelo Green. Plaintiff DeAngelo
Green learned that Mattrew Holt was supplying confidential
information to S.C.C.C. staff regarding fellow offenders,
and was receiving para-benefits from SCCC staffs.

16.    By way of Mattrew Holt's staff associations, he and
his fellow gang members began to terrorize plaintiff DeAngelo
Green with daily threats of violence, and the filing of false-
charges against him.

17.    Plaintiff DeAngelo Green sought the assistance of the
SCCC Mental Health Staff to help combat his recent suicide
ideation. exhibit three.

18.    Mattrew Holt, through his influence with memebers of
the SCCC staff, attempted to have himself moved into the
plaintiff DeAngelo Green's cell; exhibit ████.

19.   On the first of August of 2015, Mattrew Holt, under the
knowledge and support of SCCC staff, did enter the cell of DeAngelo
Green and proceed to physically assault Mr. Green. exhibit five.

20.   Mattrew Holt filed prea(Prison Rape Elimination Act) complaint
against  the plaintiff DeAngelo Green soon as they were locked
up in SCCC IMU exhibit ~~six~~ Five

21.   Plaintiff DeAngelo was instructed by the chief of the I&I
department to withdraw his public records request into the prea
history of Mattrew Holt, or be subject to serious reprisal. exhibit
~~seven~~. oNE

22.   In September, 2015, Plaintiff DeAngelo Green learned fron
his friend, offender Cody Allen, that Mattrew Holt, from his cell
in the IMU (Intensive Management Unit) was actively pursuing means
to facilitate the murder of plaintiff DeAngelo Green.

23.   Mattrew Holt's prea allegations against DeAngelo Green were
ruled "Unsubstantiated" by Margaret Gilbert, superintendent of
SCCC. exhibit ~~eight~~. FivE

24.   Plaintiff DeAngelo Green was admitted to SCCC mental health
and placed under 72 hour suicide-watch, then remanded to SCCC
administrative segregation, where he remained until November 17,
2015. exhibit ~~nine~~. thRee

25.   Sometime between Nov 17, 2015, and Nov 25, 2015, Mattrew
Holt ordered a "hit" on plaintiff DeAngelo Green.

26.On Novemember 26, 2015, offender Cody Allen, while armed with
a weapon,, did use a weapon to physically attack plaintiff DeAngelo
Green while he exited the SCCC dining hall. As a result of the
attack, plaintiff DeAngelo Green was knocked out unconscious and
sustained substantial injuries to his head, ear and face. exhibit
~~ten~~. FivE

27.This attack was unprovoked, and has since caused DeAngelo Green
to exist in a perpetual state of fear that he will again be
physically attacked. As a result of the attack, Plaintiff DeAngelo
Green has been subject to post traumatic stress, persistent anxiety,
night-tremors, suicide ideation, uninary incontinence, and bouts
of severe agoraphobia exhibit ~~eleven~~. FivE

28.   SCCC staff clearly violated Wa/DOC policy and procedure before
during, and after the attack upon plaintiff DeAngelo Green. Staffs
were not at their assigned posts during the attack upon plaintiff
DeAngelo Green, nor did they radio-in accurate and/or relevant
information to responding officers, thus allowing plaintiff DeAngelo
Green's assailant to exit the dining hall unhindered. exhibit ~~12A~~ FivE.

29.~~Because Cody Allen#      # was permitted to exit the dining hall,~~

29.    Because Cody Allen#37924# was permitted to exit the dining
hall, he was able to discard----or pass off----the weapon with
which he attacked plaintiff DeAngelo Green. exhibit ▨. 5

30.    During their investigation, SCCC staff misidentified plaintiff
DeAngelo Green's attacker, and detained and questioned the wrong
offender. The attack upon plaintiff DeAngelo Green took place in
a known "blind-spot", and is located immediately before the offender
exit of the dining hall. The area in which the attack of plaintiff
DeAngelo Green occurred has long been identified by SCCC
Administrative Personnel, Correctional staff, and offenders, as
an area that is frequently utilized by offenders to physically
attack other offenders. exhibit ▨. 5

31.    Plaintiff DeAngelo Green was sent to an outside hosiptal
where the nurse made it clear that Mr. Green wounds shows that
a weapon was used on him in that attack on Mr Green 11-26-15 at
SCCC. exhibit ▨. 5

32.    Around February of 2016, Plaintiff DeAngelo Green was
transferred to Coyote Ridge Correctional Center, Connel, Washington,
where he was assigned to a cell occupied by a known associate of
(and fellow gang member) of Mattrew Holt. exhibit 16.

33. Plaintiff DeAngelo Green was informed by his cellmate that
Mattrew Holt's brother was incarcerated at CRCC, and that individual
and others within the Gangster Disciples faction, meant to do him
harm, or "finish" the job begun by Mattrew Holt. Plaintiff DeAngelo
Green requested an immediate transfer to Administration Segregation.
That request was denied by the CRCC staff. exhibit 17.

34. Plaintiff DeAngelo Green requested an immediate transfer to
Administrative Segregation because his life was in a maze of danger.
CRCC Administrative Personnel and Correctional staff knowingly
refused to separate DeAngelo Green from known gang members, and
known gang- factions that meant to do him harm. exhibit 18.

35. Plaintiff DeAngelo Green was notified by CRCC staff that he
was in danger, and was abruptly transferred to the Medium Custody
facility at Washington State Penitentiary, Walla Walla, Washington.

36.    Plaintiff DeAngelo Green continued to receive death threats
from the associates of Mattrew Holt while at W.S.P.

37.    Immediately upon his arrival, WSP staff fostered an atmosphere
of derision, and were openly hostlie towards plaintiff DeAngelo
Green. In an attempt to (trap) plaintiff DeAngelo Green, WSP unit
staff would discreetly inform each new cellmate with regard to
Mr. Green's prior false prea claims and place in his room only
those individuals they were certain would inform on him, and/or
level false-claim against him exhibit 19.

38.    Plaintiff DeAngelo Green continues to be harassed and maligned by WA/DOC Personnel, and has had to exist under the constant threat of intimidation, frivolous-infraction, and retribution, for his pursuit of legal remedies and relief from the state of Washington, the Washington Department of Corrections and those employed therein.

39.    Because those employed by the WA?DOC have consistently failed to respond to, or appropriately investigate numerous credible threats to the life and well- being of plaintiff DeAngelo Green, he is forced to exist in a state of unrelenting fear that he will again be harassed, physically attacked, and subsequently killed at the hands of Mattrew Holt's associates.

## V.EXHAUSTION OF LEGAL REMEDIES

40.    Plaintiff DeAngelo Green used the prisoner grievance procedure available at Stafford Creek Correctional Center to try to solve the problem surrounding the assault on him 11-26-15 on SCCC soil. Plaintiff DeAngelo Green presented the facts relating to this complaint a week after he was brought back from the outside hospital Grays Harbor . Plaintiff DeAngelo Green was denied of his grievance on every level. The plaintiff asked them so many questions that embrace policy yet the superintendent denied his appeal. Everyone that was in rank and power had the sence of loyalty so they all refused to answer my direct questions in my grievance. Plaintiff DeAngelo Green filed a tort claim once he finished with the grievance levels, he waited the statutory time period, and otherwise complied with the statutory requirements of bringing this action.Exhibit 10.. 3

## VI.LEGAL CLAIMS--Failure to protect

41.    The failure of the Defendants to act on their knowledge of a substantial risk of serious harm to Plaintiff DeAngelo Green violated his eighth Amendment right to be free from deliberate indifference to his safety. As a result of Defendants failure with turning a blind eye too. The plaintiff DeAngelo Green was viciously assaulted and received serious physical and emotional injuries.

11

42.    The State of Washington Department of Corrections, Stafford Creek Correctional Center, Coyote Ridge Correctional Center, Wsahington State Penitentiary, and/or Representative Agents therein did knowingly, directly, and willfully place my life in danger.

43.    The Defendants failed to exercise reasonable care in their trainning. As a proximate result of said acts and/or ommissions, plaintiff has suffered emotional distress and received marks on his face for life.

44.    The defendants violated  the plaintiff Eighth and Fourteen Amendment rights.
(A)By failing to act upon their knowledge of a substantial risk of serious harm posed to me, the defendants did knowingly, directly, and willfully violate my Eight Amendment right to be free from the infliction of cruel and unusual punishment.

45.    The United States Supreme Court has set two tests that a prisoner must meet to establish an Eighth Amendment claim: The failure of Defendant Margaret Gilbert and Defendant Michael Gleason to act on their knowledge of a substantial risk of serious harm to plaintiff violated his eighth Amendment right to be free from deliberate indifference to his safety.

46.    As a result of the defendants failure, plaintiff DeAngelo Green has been in constant fear. The plaintiff was not given "equal protection of the law, the defendants violated the plaintiff fourteen Amendment.
(A)Triable issues of material fact related to the Department of Corrections awareness of an objective substantial risk of harm to the plaintiff. The defendants was grossly negligent in their failures to protect, investigate, and separate the plaintiff from danger.


                    Negligent Failure to Protect

47.Defendant Margaret Gilbert, Defendant Michael Gleason and Defendant John Doe 1-10 owed Plaintiff DeAngelo Green a duty of reasonable care to protect him from being assaulted by other inmates,

48.Each defendant breached that duty by failing to provide protection when the plaintiff infromed them along with Mental Health of his fear of being assaulted. That breach of duty resulted in serious physical and emotional injuries and damages. The breach of duty proximately caused those damages.

### VII. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully pray that this court enter judegment:

49.    Granting Plaintiff DeAngelo Green a declaration that the acts and omissions described herein violate his rights under the Constitution and laws of the United States.

50.    Declare that the defendants violated plaintiff Green Eighth and Fourteen Amendment right to his safety.

51.    Grating Plaintiff DeAngelo Green compensatory damages in the amount of $2,000,000,000 against each defendant, jointly and severally

52.    Plaintiff DeAngelo Green seek punitive damages in the amount of 1,000,000,000.

53.    Plaintiff also seek a jury trial on all issues triable by jury,

54. Plaintiff also seek recovery of the cost in this, and

55. Any additional relief this court deems just, proper, and equitable.

Dated: *Oct 27, 2017*

Respectfully submitted,
DeAngelo Green #310589#
Washington State Penitentiary
1313 N 13th Ave
Walla, Walla, Washington 99362


### VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Washington State Penitentiary Medium(Victor unit)

DeAngelo Green

<u>DECLARATION OF DEANGELO GREEN</u>

I, Deangelo Green, declare under penalty of perjury that the following statement is true and correct:

1.     I am the plaintiff herein and am competent to testify. The following statement is based on my own first hand knowledge unless otherwise indicated.

2.     On _____, 2012, I arrived at SCCC (Stafford Creek Correctional Center), where I was soon befriended by Offender Anthony Forshaw, WA/DOC #_____.

3.     Mr. Forshaw was seeking a work-out partner, and, as would later come to light, hoping to gain a confidante with whom he could collude and conspire in the hopes of furthering his corrupt agenda.

4.     Subsequent to forming a friendship with Mr. Forshaw, I was approached by numerous Offenders and "warned" of his history as a heavy user of Meth-amphetamines, of his reputation as one who facilitates rumors and lies, and of his penchant for reporting the misdeeds and misconducts of his fellow Offenders to DOC Staff.

5.     As I came to know Mr. Forshaw on a personal level, I was dismayed to find that his purported methamphetamine addiction was in fact very real; as were the character deficiencies with which he was rumored to be afflicted. It was soon evident that the consequences of Mr. Forshaw's many addiction-based choices had him in-conflict with certain factions "Gangs" that existed within the Institution.

DECLARATION OF DEANGELO GREEN - 1

6.      Despite these red-flag warnings, and despite the difficulties Mr. Forshaw was encountering in relation to his drug use and gang affiliations, I continued to work-out and spend time with him. I believed I could help to enlighten this young man, and within a brief span of time we developed a relationship in which I assumed the de facto role of Mentor. Mr. Forshaw seemed an amiable student, one desperate for guidance from an individual he viewed as as a competent, well-seasoned Offender. Essentially, I tried to foster a big brother/little brother kinship with Mr. Forshaw, and I was of high hopes that I could help "turn him around".

7.      In time, I discerned Mr. Forshaw possessed no true desire to amend his behaviors. It had become apparent that my hope of assisting Mr. Forshaw further himself intellectually  had reached its inevitable, albeit unsuccessful conclusion. Soon thereafter, I chose to cut ties with Mr. Forshaw. In doing so, I offended him, and thus, became the unwitting recipient of his vengeance.

8.      True to his reputation, Mr. Forshaw immediately began disseminating rumors about me to fellow Offenders, and eventually, to members of Staff. Mr. Forshaw's unsubstantiated allegations resulted in a lengthy list of Infractions, for which I was charged, then promptly remanded to the IMU (Intensive Management Unit), where I remained until DOC Staff completed their investigation.

9.      Mr. Forshaw's allegations were nothing short of farcical, and I relished the opportunity to dispute them during my Infraction Hearing. Unfortunately, I was unable to do so because the SCCC Hearing Officer, Ms. Jerkins, was forced to dismiss the charges under the rule of Procedural Error. I.E. by failing to document information pertinent to their

DECLARATION OF DEANGELO GREEN - 2

investigation, SCCC Criminal Investigators (I&I) failed to adhere to DOC
Policy, and by default, the Infractions were dismissed and I was returned
to my Housing Unit.

10.    Within twenty-four hours of returning to my Unit, I was again remanded
to the SCCC IMU. Though I was not Infracted for any cause or event, I was
informed that I was to be demoted one Custody Level, and sent to the Closed
Custody facility at Walla Walla, Washington. I was further informed that
I would be required to serve one year there, free of Infractions, before
being eligible to return to SCCC.

11.    On _____, 2012, I arrived at WSP (Washington State Penitentiary,
Walla Walla, Washington), where I spent the following year, Infraction free,
working in the WSP Dog Training Program.

12.    On _____, 2013, while preparing to return to SCCC, I was remanded
to Federal Custody for issues related to my original Sentence.

13.    On _____, 2014, I was again remanded to the custody of WA/DOC,
and transferred to the Stafford Creek Correctional Center, Aberdeen, WA.

14.    Subsequent to my SCCC Intake, I was assigned to the H-2 Housing Unit,
and placed into a cell with an Offender I did not know, but "knew of".
This individual was a well-known informant who, in order to gain favor with
Staff, would routinely inform on fellow Offenders.

15.    Because this individual was a known-informant, I became concerned
that other Offenders would come to view me as a likely accomplice to his
treasons. I immediately approached Ms. Jerkins, who was my former Hearing
Officer, and now CUS (Custody Unit Supervisor) of H-2, and requested that
she re-evaluate my current cell assignment.

DECLARATION OF DEANGELO GREEN - 3

16.     Initially, Ms. Jerkins seemed receptive to my plea. However, because of my Cellmate's reputation as a "Snitch", Ms. Jerkins was unable to locate an Offender willing to share his cell. Knowing full well that any individual she chose to house with this person would immediately request a cell-reassignment, Ms. Jerkins would "pluck" an individual from the weekly chain-bus, and simply "hope for the best".

17.     Soon thereafter, my living situation became unbearable. My cellmate was constantly informing on other Offenders, and had begun to disseminate rumors about me throughout the Institution. I again approached Ms. Jerkins and requested a cell move, which she denied.

18.     The following Sunday, however, I was instructed by Unit Staff to pack-up my property, and told I was being transferred to G-Unit. This was an unusual occurence, as Unit transfers are seldom, if ever, conducted on a Sunday; nor had I been given any prior notice. Later that day, while awaiting escort to G-Unit, I was informed by Staff that because of an issue with my (G-Unit) cell, I wouldn't be moving until the next day.

19.     The following day, Ms. Jerkins appeared surprised to see me still in the Unit, and refused my request to discuss my pending move, or any aspect therein. Instead, I was escorted by Staff to G-Unit.

20. Once in G-Unit, I was approached by Offender Mathew Holt, WA/DOC #_____, who is known by the nickname "Boo". Mr. Holt went to great efforts to know me, and I became uncomfortable with his nearly-constant attentions. I soon learned that Mr. Holt was a member of the "Gangster Disciples" street gang. I would learn too that Mr. Holt was a closeted homosexual, and was known to have filed numerous PREA (Prison Rape Elimination Act) claims at various other Institutions.

DECLARATION OF DEANGELO GREEN — 4

21.     Being of the mindset that "one should grow where one is planted", I had returned to SCCC with a fervent desire to succeed. Unfortunately, my aspirations conflicted with Mr. Holt's debauched agenda. And though I didn't know it then, Mr. Holt's obsession with me would soon have me fighting for my very survival.

22.     It was known that Mr. Holt was trading sexual favors in the Unit, although he would become incensed with any mention of his homosexuality, he continued to "bait" Offenders into acts of depravity.

23.     Eventually, Mr. Holt would seek me out in the Yard, approach me in the dayroom, and even come to my door in the hopes of enticing me with his homosexuality. As I am not a homosexual, I continued to reject his advances. It was then that Mr. Holt changed tactics. He initiated a relentless barrage of physical and mental intimidation.

24.     When Mr. Holt's threats of physical violence failed to produce the results he desired, he began threatening me with regard to my reputation, and even made claim that he could, because of his standing with Institutional Personnel, have my Custody Level altered.

25.     As I would come to learn, Mr. Holt's influence amongst Staff was evident in-that no matter his behavior, he would rarely be Infracted. On the rare occasion when a staff member would "write up" Mr. Holt, he would routinely be found not guilty.

26.     Unbeknownst to me, Mr. Holt had been exploiting his "Staff Connections", by actively seeking to have himself reassigned to my cell; He even approached the SCCC Superintendent, Pat Glede, and requested that he "make it happen". I only learned of Mr. Holt's intention, because it had become fodder for gossip within the Institution.

18

27.     In an effort to negate Mr. Holt's hope of becoming my cellmate, I immediately notified Sgt. Dickerson, and informed him of my aversion to living with a homosexual. Additionally, I referenced my history of discord with Mr. holt, and noted that regardless of his sexuality, moving this individual into my cell would prove problematic for both he and myself.

28.     I then confronted Mr. Holt directly. I informed him that I was not interested in sharing quarters with him, that I possessed no desire to engage in homosexual behavior, and requested [again] that he stay away from me.

29.     Mr. Holt was livid, and vowed to "destroy me". Then, in late July, 2015, I entered my cell and was confronted by Mr. Holt; (who was already in my cell). Mr. Holt asked if we could talk, to which I replied that he'd better make it quick. Tears immediately welled in his eyes, and he began speaking of his childhood; of being sexually molested by a family member when he was a child, and how he learned at a very young age to manipulate people by exploiting their sexual proclivities.

30.     Mr. Holt's story was a sad one, and I told him so. I felt sorry for him, but told him too that I needed to focus on my own issues. Mr. Holt then offered to perform oral sex on me, and asked me to penetrate him anally. I again refused his advances, and ordered him out of my cell. Mr. Holt then exposed himself, and said that if I would allow him to perform just one single sexual act, he would then leave me alone for good. Exasperated, I again ordered him from my cell, warning him repeatedly that he'd better stay away from me. Mr. Holt then exited my cell, but not before (again) vowing to "Destroy me".

DECLARATION OF DEANGELO GREEN - 6

31.     For the next week, Mr. Holt, and the crowd with which he surrounded himself, subjected me to an endless onslaught of insults, taunts, and threats of imminent physical harm. Mr. Holt reminded me frequently that he was a "GD" (Gangster Disciple), and that he would "get me".

32.     On the evening of August 1, 2015, I observed Offender Holt in the G-Unit Sergeants Office, speaking at length with Sgt. Rothwell. Because of my history with Mr. Holt, and because of the furtive glances I'd been receiving from him while in the Sergeants Office, I believed myself to be the subject of their conversation.

33.     Within ten minutes of concluding his meeting with Sgt. Rothwell, Mr. Holt ran into my cell and physically attacked me while my back was turned. Several moments into the attack, Mr. Holt's cellmate, _____, WA/DOC #_____, entered my cell and pulled Mr. Holt from atop me.

34.     This was a planned physical assault, or "Hit". It was carried out at a specific time of day (ten minutes prior to the closing of dayroom), and was to be witnessed and subsequently "broken up" by Unit Staff. Specifically, Mr. Holt, in collusion with Sgt. Rothwell, planned and executed the assault.

35.     Sgt. Rothwell appeared unconcerned with the fact that Mr. Holt had entered my cell—a Major Infraction—and was interested only in what I may have said to Offender Holt; though it was clearly evident I hadn't said anything to Offender Holt prior to his entering my cell. Sgt. Rothwell was clearly inferring that (my) actions, and not those of Offender Holt, had precipitated the attack. Sgt. Rothwell maintained an unwillingness to accept the fact that it was not me, but Offender Holt that perpetrated the attack. I stated to Sgt. Rothwell, unequivocally, that it was Offender Holt that entered (my) cell to attack (me), and not the other way around.

DECLARATION OF DEANGELO GREEN - 7

20

36.     Regardless of the fact that I had just been the victim of an un-provoked physical attack, I was immediately remanded to the IMU—while my attecker was escorted to the SCCC medical facility for evaluation.

37.     On 8/2/2015, Offender _____, (Offender Holt's cellmate), was remanded to the IMU. He was placed in the same Pod as Myself, and we spoke at length about Mr. Holt. I would learn that Mr. Holt, due to his role as a confidential-informant, received a litany of para-benefits from Institutional Staff. In fact, Mr. Holt enjoyed free run of any Custody Unit to which he was assigned, and could essentially roam-at-will within the bounds of the Institution.

38.     Free from consequence, Mr. Holt was permitted to target and victimize those Offenders he desired for sex. When his affections were rebuked, he would become obsessed with "Destroying" the individual responsible. Absurdly, Mr. Holt would often initiate a PREA Complaint against the very Offenders (he'd) been pressuring for sex.

39.     During my IMU conversations with Offender _____, I concluded that Mr. Holt was an extremely confused and angry individal. It was evident that his core-fear centered on the possibility of his family and/or fellow gang members learning of his homosexuality—quite possibly, he loathed himself for his depravities.

40.     Accordingly, it was the pattern of Mr. Holt to prey upon those Offenders he viewed as week, timid, and susceptible to mental manipulation and coercion through means of violence, or the threat thereof. However, Mr. Holt had professed boredom with the ease at which he was able to exploit the frightened "green" Offenders he'd been defiling.

21

41.     Mr. Holt was piqued by my reputation as a "true Convict", and had come to perceive me as a challenge to be conquered. He was aware that I often mentored individuals on & off the weight-pile, and believed, erroneously, that I could be manipulated into a homosexual liaison.

42.     Ostensibly, it was Mr. Holt's inability to control or intimidate me that proved the catalyst for his hatred of me, and of his wish to see me harmed. Additionally, Mr. Holt feared that I would "out him" as a homosexual, when truly, I possessed no interest in any aspect of Mr. Holt's life.

43.     On 8/17/2015, I was released from the IMU and sent back to G-Unit. At that time Mr. Holt was in the IMU, and I believed myself to be well-rid of both him and his insanity. Unfortunately, those in Mr. Holt's social circle continued to harass me, and I learned that Mr. Holt was sending messages from the IMU in which he     instructed these individuals to "Take me out".

44.     I was living each day under threat of imminent harm, and soon received word that "Something big" was coming my way.

45.     In an effort to avert further violence, I attempted to contact Mr. Holt via third-party. It was my hope that he might (finally) listen to reason. I wanted Mr. Holt to know that I wished him no ill will, and that if he would simply leave me alone, I would never speak of his sexual orientation to ANYONE.

46.     At the suggestion of Offender _____, I decided to contact Mr. Holt's family. I was not looking to inform them of Mr. Holt's homosexuality. Instead, I was hoping they might intercede, and thus, help resolve the animosity between Mr. Holt and myself.  This only proved to anger Mr. Holt more, and he vowed to have me killed.


DECLARATION OF DEANGELO GREEN - 9

47.     Knowing that Mr. Holt was quite capable of orchestrating a "Hit" from the confines of the IMU, my nerves had become unraveled. I was being tormented by the unabated threat of being physically attacked, and soon recognized that my mental health state was in crisis.

48.     Because I had contacted SCCC Mental Health previously with regard to issues concerning Mr. Holt, they were keenly aware that I feared for my life. In fact, my fear of being killed by Mr. Holt and/or his associates had become so great, and my avenues for relief so few, that I was contemplating self harm just to hasten the inevitability of my demise.

49.     I received scant assistance or concern from those in Mental Health, and again found myself in G-Unit.

50.     In G-Unit I was approached by Offender Cody Allen, WA/DOC #_____. Mr. Allen had just come from the IMU, where he'd been in the same Pod as Mathew Holt. Mr. Allen had the opportunity to speak at length with Mr. Holt, and said he'd been concerned by the level of Mr. Holt's paranoia, and of the many delusions upon which he seemed to focus.

51.     Mr. Allen professed curiosity about Mr. Holt's evident obsession with me, and of his wish to see me harmed. Mr. Allen told me that Mr. Holt had professed to those within earshot that he'd filed a bogus PREA claim against me, and that he planned to have me killed.

52.     Worried though I was, I felt I'd discovered a kindred spirit in Mr. Allen. He understood, and had witnessed with his own eyes, that Mr. Holt was in fact a very unhinged individual, and recognized, too, that Mr. Holt's allegations against me were mere fantasy.

DECLARATION OF DEANGELO GREEN - 10

53.     Shortly thereafter, I began working-out with Mr. allen, and we developed a close friendship. Like so many young men today, Mr. Allen had been sexually abused as a child. He told me of the "adults" in his life that had harmed him, and how his father had introduced him to both drugs and gang-life at a very early age.

54.     Mr. Allen and I would often pray together. We focused upon our shared desire to achieve common goals, and would assist each other in coping with the pressures of incarceration.

55.     It's important to note: Mr. Allen is white (Caucasian). However, he had chosen to go against prison-norm by associating himself with the Native faction. The fact that Mr. Allen had formed a close relationship with me (a Black male) wasn't setting well with the Native Organization, and they began pressuring Mr. Allen to cease working-out and/or associating with me.

56.     It was around this time, September, 2015, that I was interrogated by Mr. Gleason, Chief of I&I (Institutional Investigations), in reference (he claimed) to my previous third-party contact with Mr. Holt.

57.     In reality, Mr. Gleason was agitated by my recent Public Records Inquiry concerning Mathew Holt's prior PREA allegations. To I&I, Mathew Holt's willingness to inform on his fellow Offenders represented a veritable treasure-trove of actionable-intelligence; such intelligence had, and would continue to immensley-contribute to future investigations. Ostensibly, Mr. Gleason viewed my inquiries into Mr. Holt's records as a threat to his Institutional Surveillance Program.

DECLARATION OF DEANGELO GREEN - 11

24

58.     Mr Gleason knew of Mr. Holt's obsession with me, and was aware that
I remained under constant threat of violence from Mr. Holt, and/or his
associates. I told Mr. Gleason that I simply needed to clear my name; that
I couldn't have a "bullshit PREA claim" hanging out there; and that I would
continue to pursue the issue until a resolution presented itself.

59.     I provided Mr. Gleason with numerous specifics in reference to Mr.
Holt's predatory behaviors, and questioned his own ethics in knowingly
allowing such an individual the freedom to seek out, then stalk potential
victims. I again stressed my need, as a Convict, to clear my name. Mr. Gleason
noted that I have served time throughout the United States, and suggested
I shouldn't have any trouble with "Reputation" in such a "weak style prison"
as this.

60.     Mr. Gleason underlined_insisted that I submit a letter to the Office of Public
Disclosure, withdrawing my request for any records pertaining to Mathew Holt.
Mr. Gleason told me that Offender Holt was important to him, and said that
if I refused to cease my current inquiries into Mr. Holt's PREA history,
he would place me in Administrative Segregation for the foreseeable future.

61.     Feeling under immense pressure to comply with Mr. Gleason's "request",
I withdrew my Public Records Inquiry into Mathew Holt. Note; I provided the
G-Unit CUS, _____, with documentation confirming the withdrawal of
my Public Records Inquiry; (This was noted in G-Unit log book).

62.     At the time, I continued to workout with Cody Allen. Mr. Allen and
I had become close friends, and we came to know each other quite well. I
spoke regularly to his Mother, Kimberly Betty, and she was happy that her
son had finally acquired a friend with whom he could well-relate.

DECLARATION OF DEANGELO GREEN - 12

25

63.     On October 22, 2015, Cody Allen informed me that the Native Offenders
with whom he associated himself, had instructed him to terminate his
relationship with me. Mr. Allen claimed that he was receiving too much "heat"
in reference to our friendship, and though he adamantly opposed their position,
he would find himself in danger if he failed to comply with their edict.

64.     That same day, October 22, 2015, I was abruptly placed in Administrative
Segregation, so that I&I could further investigate Mathew Holt's (prior)
PREA claims against me. Note: Mr. Holt's prior PREA claims were investigated,
and subsequently ruled "Unfounded" by the SCCC Superintendent, Ms. Gilbert.
However, in an effort to cause me further complications within the Institution,
Mr. Holt "Grieved" the Superintendent's findings—which resulted in the reopening
of the investigation.

65.     Admittedly, the pressures associated with Mr. Holt's unwelcome
intrusions upon my life had, again, caused me to question the state of my
own mental health. I felt the walls were closing in on me, and I began to
intuit the pressures and fears under which I had fallen victim, as a harbinger
of the violent attack to which I would soon be subjected.

66.     At that point, I felt I had no options but conclude my life by my
own hand. I reported my suicide ideation to IMU Staff, and was immediately
placed on suicide-watch. Soon thereafter, I was interviewed by a Mental Health
Psyche Associate, but his counsel offered scant assistance, and I was left
alone to contemplate my wish to end my life.

67.     On October 26, 2015, after three days under suicide-watch, I was
transferred back to Administrative Segregation, where I would remain until
November 17, 2015.

DECLARATION OF DEANGELO GREEN - 13

26

68.     While I was in Administrative Segregation, it had been made known by certain powerful Offenders on Mainline, that those caught associating with me would be subject to violent reprisals. This action effectively rendered me "untouchable", and my return to Mainline proved both complicated and dangerous.

69.     Mathew Holt had, from his IMU cell, initiated efforts that he knowingly believed would culminate in my murder. He sent numerous clandestine messages to Native elders, in which he reiterated his wish to have me killed. Mr. Holt made it known that he, as a representative of the Gangster Disciples, would consider it a personal favor if the Natives would (help) facilitate my murder.

70.     At the time, the Native faction was politically-aligned with the Gangster Disciples. Accordingly, the Native elders believed that assisting the Gangster Disciples in furthering their agenda now, would prove beneficial to their own agenda later.

71. Inasmuch as Cody Allen is non-Native, his loyalties were considered expendable. Mr. Allen was viewed by those in the Native alliance as one they could easily wheedle, and saw his desire to please those above him as a trait they could exploit. Essentially, the Native elders chose to sacrifice Mr. Allen to their objective, and began to systematically groom him into the role of assassin.

72.     It was the opinion of the Native elders, that because of our prior friendship, Cody Allen could approach me without being perceived as a threat. Thus, between October 22, 2015, and November 26, 2015, in an effort to impugn, malign, and vilify me, the Native elders subjected Cody Allen to an unabating

DECLARATION OF DEANGELO GREEN - 14

torrent of misinformation, in which they portrayed me as a monstrous predator.

73.     On November 26, 2015, while exiting the SCCC dining hall, Offender Cody Allen physically attacked me from behind. I was immediately rendered unconscious, then, armed with a weapon, Offender Allen slashed and stabbed me in the area of my head and face. Offender Allen then proceeded from dining hall, unimpeded, leaving me unconscious, laying in a pool of my own blood.

74.     Of the (five) Correctional Officers patrolling the dining hall, none had witnessed the attack; nor, he claimed, had the Officer standing just outside the dining hall. The Officers staffing the dining hall had only discerned of the attack, they claimed, because several Offenders were looking toward the direction in which the attack occured.

75.     When those Officers finally approached that area, they discovered me laying unconscious, bleeding profusely from several puncture wounds and/or lacerations to my head and face.

76.     I was unconscious for several minutes, and awoke surrounded by Correctional Staff, and at least one individual from the SCCC Medical Staff. I immediately asked what happened, and who did this to me? I was informed that I had been the victim of an assault. I asked repeatedly; "Who did this to me...? Which race...? What was the weapon...?", but the Officers refused to address my questions.

77.     As it were, my wounds proved to severe for treatment within the Institution, and I was transported to the Greys Harbor Community Hospital Emergency Room, Aberdeen, Washington. Once there, the ER Staff further evaluated, then treated my wounds.

DECLARATION OF DEANGELO GREEN - 15

78.     Because of the nature and severity of my injuries, it was the opinion of the Greys Harbor Medical facility Personnel that my wounds were consistent with those inflicted by a sharp-weapon.

79.     I was then transported to SCCC, where I was placed in Administrative Segregation; which is Standard Procedure while Staff conduct their investigation.

80.     Before, during, and after my assault, the dining hall Correctional Staff; the outside Sentry; those Officers and Administrative Personnel responsible for securing the crime scene; and those Officers responsible for apprehending my assailant, had, collectively, <u>failed</u> to follow DOC Policies and procedures.

81.     As a result of the Staff's dilatory negligence, my attacker was permitted to exit the dining hall unabated, thereby affording him the opportunity to return to his housing unit, where he could discard, or "pass-off" his weapon to another Offender.

82.     Initially, DOC Staff misidentified my attacker, and placed the wrong individual in the IMU. Later, upon receiving "a tip", then reviewing the video, Staff identified Offender Cody Allen as the person responsible for my assault.

83.     The behavior and actions of the Officers staffing the dining hall, and of the outside Sentry, are in conflict with their DOC training. Because the dining hall is arguably the busiest area within the Institution, Officers are required to "post-up" at specific locations therein. This is done so that any potential emergency can be quickly addressed. However, on the day of my assault, Officers failed to follow established DOC Protocol. In fact, it appears Officers were <u>intentionally remiss</u> in their duties, and were, by purposely avoiding the area in which my assault took place, knowingly abetting my assailant.

DECLARATION OF DEANGELO GREEN - 16

84.    Additionally, because of the high concentration of Offender movement in and around the SCCC dining hall, it has become known—to both Staff and Offender—as a convenient location in which to launch assaults. Because this is so, SCCC Administration requires dining hall Staff to be exceptionally alert to, and anticipatory of, potential Offender on Offender violence.

85.    In further disregard of DOC regulatory procedures, the Officer that "radioed-in" the incident, reported a "fight" in the dining hall. This Officer was clearly aware there was no active-altercation in the dining hall, and was aware, too, that the individual responsible for the attack had (already) exited the location.

86.    Had this Officer had adhered to established protocol, he would have radioed-in that an assault (had) occurred, then instructed responding Officers to detain those Offenders exiting the dining hall; Specifically, those Offenders moving on the breezeway. Had this protocol been followed, my assailant would been detained and searched, and his weapon recovered.

87.    In addition, there was no discernible attempt by SCCC Staff to preserve the integrity the crime scene. My glasses, broken during the attack, went missing; although they were supposedly inventoried, then placed into a bio-hazard "red bag", along with my bloody ID card and cell key. By their inept-management of the crime scene, it is possible, even likely, that members of SCCC Staff may have recovered, then "disposed" of the weapon used in my attack.

88.    I'd been in the IMU for    a short time, when, unexpectedly, I began receiving "prison-grapevine" messages from Cody Allen; he had been placed in the Pod adjacent to my own, and was attempting contact through third-party means. It was through this third party  that Cody Allen informed

30

me that he was sorry, that he hadn't wanted to be responsible for my attack, and that he'd been forced into stabbing me by faction-members above him.

89.     Because I knew Cody Allen well, and had come to know his family, I chose to believe the sincerity of his words. Cody Allen said he had been provided with a weapon, and instructed by his fellow gang members to "hit me hard & fast", and to "leave me dead".

90.     Cody Allen made it known to me that because of our relationship, he'd been unable to follow through with his instructions, and couldn't bear to actually see me dead. Cody Allen relayed his insistence that I had been like a father to him, and noted that I had been there for him when no one else was.

91.     In describing his own recollection of my assault, Cody Allen alluded to his surprise with respect to the amount of time he'd had to initiate and sustain his attack. He stated that he began praying someone would intervene, and was dumbfounded that not a single Officer appeared to notice an assault taking place a mere twenty feet away.

92.     In retrospect, Cody Allen believed he'd been provided ample time to "finish me off", but simply couldn't follow through. Instead, he ceased his attack, and merely walked away. Mr. Allen claimed astonishment in-that he was able to simply walk past the outside Sentry, then proceed unemcumbered to his housing unit. Cody Allen, wearing my blood, had even been passed, unnoticed, by SCCC Staff responding to the dining hall.

DECLARATION OF DEANGELO GREEN - 18

31

93.    It was Cody Allen's belief, and I concur, that my presence in the Institution was cause for concern amongst the Staff. I&I Investigators had confirmed to me that I was a threat to their "flow of information". I was then threatened, berated, and coerced into withdrawing my Records Inquiry into Mathew Holt's prior PREA history.

94.    CUS Jerkins, Sergeants Colemen and Rothwell, other SCCC Personnel, and even Superintendent Gilbert conspired with known gang members, and are thus directly, or indirectly, responsible for the corresponding threat to my life, and for the subsequent attempt by Cody Allen to end my life in the SCCC dining hall.

95.    Cody Allen was able to attack me, undetected, while five (trained) Correctional Officers stood only a short distance away. Offender Allen was then permitted to escape the scene without the notice of Staff. Such an event could happen (only) by design, and (only) under the complicity of SCCC personnel.

96.    On _____, 2016, I was released from the SCCC IMU, then transferred to Coyote Ridge Correctional Center, a Medium Custody facility located in Connell, Washington. Upon my arrival there, I was assigned to a cell with Offender _____, DOC #_____.

97.    Offender _____, it turned out, was a known member of the Ganster Disciples, and a former neighborhood-associate of Mathew Holt. Offender _____ claimed to be already aware of "who" I was, and said he'd "received word" that I was coming; but he was noticeably taken aback to find that I'd been assigned to his cell.

DECLARATION OF DEANGELO GREEN – 19

32

98.     Offender _____, immediately began pressing me for details of my history with Mathew Holt, and of the attempt on my life. Nervous though I was, I provided him with with a brief synopsis of my interactions with Mathew Holt. Offender _____ told me that despite Mathew Holt's attempts to (hide) his homosexuality, it was considered common knowledge amongst his peers. He claimed that because Mathew Holt was a "good earner", he was allowed to remain a member of the Gangster Disciples.

99.     Offender _____ said I should have never gotten mixed up with Mathew Holt, and that he was always "playing games with that PREA bull-shit". He then made it clear that regardless of his own opinion, Mathew Holt was a Ganster Disciple, and that he would Stand for him. He then said that he and his associates (within the Institution) would meet soon to discuss my "future". He then stunned me to silence by informing me that Mathew Holt's brother, Christopher Holt, was at CRCC, and that "he", more so than anyone, would decide my fate within the Institution.

100.    As I have served many years in prison, I have come to recognize a threat, no matter how subtle, when I hear one. Being that I was alone, and assigned to a cell with an associate of the individual that had recently attempted to facilitate my murder, and because I now had cause to fear both the intentions & relevant proximity of the individual's brother, I approached a staff member and requested that I be placed in the IMU.

101.    My request was immediately denied, and I knew I was again being "set-up". I believed I would soon fall victim to another violent assault, or worse. I began to contemplate suicide, and saw it as my only means to avoid further conflict with the associates of Mathew Holt.

DECLARATION OF DEANGELO GREEN - 20

102.   I then asked to speak with Mental Health. I told them that I was in fear for my life, and that I would likely be dead (either by my own hand, or by those wishing to do me harm) within the next twenty-four hours. I was desperate, and I hoped they would place me under 72 hour observation. I prayed, in that time I might find a rational person; one willing to listen, and possibly advocate for me; one capable of recognizing that everyday I remained on Mainline, was a day in which my life was truly in jeopardy.

103.   After several weeks in the IMU, CRCC Administrative Personnel finally recognized that my presence there, living aside the associates (and brother) of Mathew Holt, represented a clear and present danger to not only me, but to their entire Institution. In speaking with the IMU Sergeant, he claimed that the DOC's decision to place me at CRCC "reeked of insanity", and he urged his superiors to transfer me out of CRCC.

104.   On _____, 2016, I was transferred to the Medium Custody facility at Walla Walla, Washington.

105.   Prison, as a whole, is a very tight-nit community. The DOC, as a matter of routine, shuffles hundreds of Offender between its various Institutions every week. That being so, I learned that Mathew Holt—until recently securing his release from prison—had been residing within the WSP IMU.

106.   I was dismayed, but not surprised to learn that Offender Holt had continued spreading his venomous fabrications about me, even here at WSP. That his propaganda continued to effect me was unfortunate. Though it was evident, by now, that I might never escape the many tentacled-lies of Mathew Holt.


DECLARATION OF DEANGELO GREEN - 21

107.   Accordingly, upon my arrival at WSP, I wanted those with questions to know the truth of it, and did my best to explain the facts. However, it was clear the Mathew Holt and his associates had muddied the waters well-before I arrived, and I saw that I would experience difficulties here to.

108.   My first cellmate (at WSP) asked me if I were Gay, to which I unequivocally replied "No". He then asked me about Mathew Holt, and of the events surrounding my assault. He said that he knew of Mathew Holt's PREA claims, and that he believed them to be lies. Then, to my utter astonishment, I learned that I was again the target of a PREA investigation, and that it had been initiated by my cellmate.

109.   Knowing that my cellmate had a close friend residing in a separate Unit, and that he'd been attempting to transfer there, it was ostensible that he'd used my recent difficulties with PREA to facilitate his move. It bears noting; a Unit to Unit move is not easily accomplished, and any Offender wishing to do so must present a compelling reason (why) they're seeking transfer. In short, by exploiting my PREA history, this individual was able to manipulate the system and subsequently achieve his end-goal.

110.   Adding to the pressure, was the fact that Unit Staff, because they didn't want me in the Unit, had went to great lengths  to effectuate trouble for me. Notably; the Sergeant responsible for cell-assignments had begun placing me with cellmates that, by design, were likely to inform him my every move, and of every perceived threat, whether it be real, or more likely, imagined.

DECLARATION OF DEANGELO GREEN - 22

35

111.   In the weeks that followed, a succession of Offenders were assigned to my cell. Each of these individuals had been made aware, by Unit Staff, of my history with PREA. It was unfortunate, but I continued to be painted with the residual "stink" of Mathew Holt's delusive-allegations. Consequently, locating a cellmate willing to give fair consideration to my unique circumstances proved nearly impossible.

112.   It is discernible that my prior PREA allegations have become a weapon to be wielded against me. This is evident in the Sergeant's efforts to "bait" me by assigning young, impressionable Offenders to my cell. If I were truly guilty of (any) PREA claims, then why would any sane person, let alone a highly-trained Correctional Sergeant, continue to (knowingly) entice a "known predator" with what is essentially a bottomless-pool of potential victims.

113.   The fact is, there is absolutely no threat of me harming any Offender in any capacity beyond that of self-defense; this is a fact known to those within the WA/DOC, yet for reasons of indemnifying themselves from legal consequence, they have allowed this travesty to morph into a Juggernaut of false-accusations & concentrated entropy.

114.   It is unfortunate, but my willingness to mentor young Offenders has been sadistically-maligned, then twisted, until it resembles something unholy and depraved. I have been serving time since early 1991, and until my time at SCC, I had NEVER been accused of seeking sexual congress with any Offender. Ever. To do so would violate every tenet of my faith, and of my moral-core.

DECLARATION OF DEANGELO GREEN - 23

36

SIGNED this 27 day of OCT ,2017, at Walla Walla Washington.

DeAngelo A. Green, Plaintiff

DECLARATION OF DEANGELO GREEN - 24

ADDENDUM TO THE DECLARATION OF DEANGELO GREEN

Supplemental to segments 50-95:

1.      In the Brief period between my introduction to Cody Allen in August, 2015, and my subsequent remand to Administrative Segregation, on October 22, 2015, he and I would develop a friendship that transcended race, creed, or faction.

2.      I first became aware of Cody Allen when he approached me in the G-Unit dayroom. Mr. Allen introduced himself as "Cali," and asked if he could speak with me in reference to Mathew Holt. As I didn't know Mr. Allen, my initial reaction was to rebuke his attempt to engage me in conversation. So, in an effort to dissuade any further entreat from Mr. Allen, I made clear to him that I possessed no desire, now or ever, to discuss Mathew Holt.

3.      In haste, Mr. Allen told me that he'd just been released from the IMU, and that during his time there, had become aware of my existence by virtue of Mathew Holt's apparent obsession of me. He claimed to have spoken at length with Mathew Holt, and began divulging many of the threats Mr. Holt had made against me.

4.      Mr. Allen was adamant in his opinion that Mathew Holt's threats were in no way benign, and that given the opportunity, Holt's obsession, and anger derived therein, would culminate in grievous harm to my person.

5.      I asked Mr. Allen why he felt it appropriate to interject himself into my business, and he assured me he held no agenda other than to caution me against the burgeoning tempest of Mathew Holt.

6.      Perceiving my skepticism, Mr. Allen further insisted that had it not been for the mad-ravings of Mathew Holt, he would have never involved himself in my affairs. Again, in haste, he relayed his first encounter with Mr. Holt

(in the IMU,) and that he'd subsequently found his behavior so incessantly disruptive and unnerving, that he was unable to concentrate, or to sleep.

7.    Mr. Allen, being new to prison, professed astonishment at the level of Mathew Holt's belligerence. He went on to describe Holt's "Cell Banging" as being merciless, without relent, and effective, in-that his actions were eliciting similar behavior from others within the IMU.

8.    Despite the fact that Mathew Holt's aggressions were being "egged on" by those around him, Mr. Allen believed that if he were able to entice Mr. Holt into a rational, cogent-dialogue, doing so might help to circumvent his truculence, and possibly cease his disruptive behaviors.

9.    After several attempts to engage Mathew Holt in conversation, Mr. allen claimed his efforts were slowly bearing fruit, but only if he were willing to entertain Mr. Holt's incoherent ramblings, perceived threats of harm, and vivid descriptions of how he planned eviscerate his enemies.

10.    Cody Allen claimed that many, if not most of Mathew Holt's prior (and current) ravings were centered on me, and that I appeared to hold the top spot upon his long list of enemies. Mr. Allen noted again that prior to his time in the IMU, he'd never heard mention of my name, but admitted to being curious with regard to who I was, and how, or why, I'd become so entwined in the delusions of Mathew Holt.

11.    Cody Allen confessed to being deeply frightened of Mathew Holt, then stated his concern that if Holt discovered he'd spoken with me, he certainly would consider it a betrayal. Mr. Allen maintained that Mathew Holt attempted to secure his assistance in seeing me harmed, and when he refused, made threats against him as well. Mr. Allen again warned me against "brushing off" any threat (or threats) made by Mathew Holt.

ADDENDUM TO DECLARATION: GREEN - 2

12.     Although Cody Allen refused to name the victim, he described a recent "Hit" that had been effected by Mathew Holt (from his IMU cell,) then carried out by members of the Gangster Disciples; (an gang to which Mathew Holt was firmly entrenched.)  Mr. Holt provided Mr. Allen with a detailed account of the attack (later confirmed by Mr. Allen,) and told him that he could hit anyone he wished, anytime he wished, regardless of his (or their) location.

13.     Mr. Allen went on to explain that although Mathew Holt had come to consider him a confidante, his position therein was tenuous at best. He believed Holt had very few actual friends: that his paranoia, unstable temperment, and constant prevarications, would keep even his family at arms length was a fact few would debate.

14.     However, in an effort to keep Mr. Holt's disruptive actions at bay, Cody Allen continued to foster a relationship with him. In doing so, Holt began opening up to Mr. Allen, and though his stark diatribes would often culminate in delineations of sociopathic fantasy, Mr. Allen believed he might help Holt to gain a more rational perspective to the world around him.

15.     Mr. Allen said that although the relationship he and Holt developed was born of necessity (in-that he'd hoped to shut him up,) he discovered Mathew Holt to be a very co-dependent individual, confused by his sexuality, and of his place in the universe.

16.     The fact that Cody Allen was himself a homosexual, helped Mr. Holt to share his history in complete candor. Mr. Allen would learn of the sexual abuse to which Holt had been subjected early in life, and of his many years of drug use. As Mr. Allen had experienced a childhood filled with similar horrors, they developed a kindred of sorts, and Holt's disruptions in the IMU became less frequent.

ADDENDUM TO DECLARATION: GREEN - 3

40

17.    Cody Allen would learn of Holt's compulsory need to fixate on the tinyest of perceived slights, and he conveyed fantasies of rape, domination, and murder, towards those he considered his enemies. In the mind of Mathew Holt, vengeance and fantasy had become one, as he would obsessively regale Allen with his twisted thoughts of harming former friends, past lovers, and even family members.

18.    In describing their conversations, Mr. Allen maintained his concern that Mathew Holt posed a great danger to me. Mr. Holt had confided many of his secrets to Allen, and within Holt's most fervent desires, was his wish to see me tortured and killed.  This, predicated upon my discovering of Holt's closeted homosexuality, and of my subsequent rebuke of his sexual advances.

19.    Mr. Allen informed me that Mathew Holt was pursuing a fraudulent PREA claim against me—a fact to which I was already aware—and that Holt was attempting to elicit those within the pod to do the same. Holt had confided to Mr. Allen that if he could "brand" me a homosexual, doing so would remove the focus from his own closeted depravities.

20.    Cody Allen derived that Mathew Holt, upon his conclusion of a homosexual relationship, or liaison, would become obsessed with destroying the individual with whom he'd just copulated. He did this for fear this person might expose his homosexuality. It would often be worse for any individual who'd spurned Holt's sexual advances, because, in Holt's mind, he would then have nothing with which to extort, or blackmail the disinterested party.

21.    Holt's weapon of choice was to file a false PREA claim against his perceived foe. Doing so, he knew, would cause that individual to be labeled a predator; a label that would follow that individual for the duration of his incarceration, or any incarceration thereafter.

ADDENDUM TO DECLARATION: GREEN - 4

41

22.    It is rare, in prison, to find an individual willing to look-out for
another, without first making sure there is something in it for them.
Admittedly, Mr. Allen's sincerity caught me off guard, in-that approaching
a complete stranger, in this environment, just to warn him impending harm
was something I'd never experienced.

23.    Setting aside my initial apprehensions, I listened in rapt fascination
to all Mr. Allen had to say. When he finished, I recognized the forming of
a new friendship; one forged of fire. In fact, it was Cody Allen's subsequent
friendship—and the fact that Mathew Holt was locked away in the IMU—that had,
inconceivably, caused me to drop my guard.

24.    I began spending time with Cody Allen, and was enjoying our daily
comradery. He and I would often pray together, and I learned of his difficult
childhood, and of those who had betrayed and harmed him. I learned, too,
of Cody Allen's introspective nature, and of his wish to improve both his
self, and his lot in life. This, he said, was of paramount importance, because
he wanted nothing so badly as to make his mother proud.

25.    Mr. Allen was aware, painfully so, that his behavior on the street,
and resulting incarceration, had nearly destroyed his mother. Because he
believed his mother to be the only person on earth that loved him, and truly
believed in him, he was determined to leave prison a better individual than
when he arrived.

26.    At Cody Allen's behest, I began working with him, training him
physically: weight lifting, cardio, and playing a variety of sports; and
assisting him in his pursuit of higher education. Working together, we devised
a curriculum of remedial studies, intended to prepare him for a correspondence
course in which he was hoping to enroll.

42

27.    I have been incarcerated for many years, and during that time, many young men have sought my guidance. Hoping, I guess, that an "old timer" might show them the ropes a bit. Despite the Mathew Holt's of this world, I have always been willing to depart my knowledge, and this was certainly true with Cody Allen.

28.    Myself and Mr. Allen would spend several hours each week studying the Word of God, then striving to apply [His] lessons in our daily lives. Like myself, Mr. Allen displayed a fondness for biblical tales of morality. Accordingly, we would quiz each other with regard to the Bible's allegories, dissecting each lesson, then concluding our day with an anecdote from our favorite parable.

29.    I considered Cody Allen to be genuine person: True of heart, and willing to go the extra mile for a friend. Certainly, I had developed a special affinity towards him, and during the course of our friendship, I had come to know his mother (Kimberly Betty.)

30.    It was Ms. Betty's opinion that her son, who she maintained was easily manipulated, and often taken advantage of, had finally befriended an individual—an adult male—with whom he could relate to on visceral level. Ms. Betty told me repeatedly that because of my influence in her baby's (sic) life, he was experiencing a spiritual rebirth. She believed, and would tell me often, that God was working through (my) hands to show her son a better path.

31.    During our many phone conversations, Ms. Betty would note her appreciation of my commitment to her son. She spoke of the positive impact I was having on him, and of the transformation in his attitude, in his temperament, and in his overall perspective. Ms. betty knew I wanted only

43

good things for her son, and would often convey her appreciation for the many kindnesses I'd shown him.

32.    In speaking with Ms. Betty, she and I had devised a series of bench-marks, each providing Mr. Allen with a significant but obtainable goal. This, we believed, would serve to bring him closer, step-by-step, to achieving the ultimate goal of successfully completing his sentence.

33.    Because I am bereft of my own child, I began to think of Cody Allen as a son. As it turned out, this was a sentiment shared by Kimberly Betty. I knew this because Ms. Betty had told me so on many occasions. Also, Cody Allen had apprised me that his mother routinely encouraged him to think of me as a father figure.

34.    It was Ms. Betty's hope that if her son would continue to open up to me, doing so might help to quell much of the pain and dejection with which he'd been so afflicted. Ms. Betty believed that (I) held the key to her son's enlightenment; that if he were both my pupil, and my son, he would then believe himself worthy of being loved.

35.    The only conflict in our relationship, was due solely to Mr. Allen's gang affiliation. It's true, that in prison, if one hopes to achieve moderate safety, he will need to align himself politically with a faction: I.E. a Gang.

36.    In Mr. Allen's case; he, being a Caucasian male, inexplicably chose to to align himself with the Institution's Native American Faction. In doing so, Mr. Allen had effectively rendered himself untouchable to his own race, and would be looked down upon by each successive race within the Institution. Especially, though, he would be considered a "race trader" by the very individuals with whom he'd chosen to align himself.

ADDENDUM TO DECLARATION: GREEN - 7

44

37.    To Kimberly Betty, I attempted to elucidate the intricacies of the prison hierarchical structure, and to warn her of her son's precarious position within the Native faction. I relayed to Ms. Betty, that "Cody," being a young (white) male, would ultimately be used to run "Missions" (I.E. Sent to attack any offender, or staff member, thought to have insulted, affronted, or aggrieved, the Native faction.)

38.    Politically speaking, Cody Allen's resolve to shun his own race was a monumentally poor decision. Unfortunately, Ms. Betty proved stubbornly resistant to my warnings that her son, in any scenario, would ultimately be used as "cannon fodder" for a race to which he owed no allegiance.

39.    Then, to my utter astonishment, Ms. Betty conceded that Cody's decision to align with the Natives was not his, but hers. Ms. Betty admitted to relying upon the advice of a former family friend—an individual of Native American decent—that had delineated a framework in which Cody Allen, once aligned with the Native coterie, would become a valued & protected member of their Circle.

40.    In response to Ms. Betty's declaration, I offered a pellucid depiction of her son's future in prison. I wanted her to understand that Cody's newly found association would not be one of bliss, but one in which his fidelity would be rewarded with benign expendability. And while Ms. Betty persistently failed to grasp the magnitude of her son's peril, I felt she was becoming less obtuse in her declinations.

41.    When pressed, Ms. Betty confessed that her desire to steer her son (away) from his own race, was predicated upon his father's Aryan affiliations; that he, too, was incarcerated; and that his incarceration was a direct result of the physical abuse he'd inflicted upon his family.

ADDENDUM TO DECLARATION: GREEN – 8

45

42.    I continued to maintain close ties with Cody, and we carried on with
our workouts and Bible studies. I knew there was no way to safely extricate
Cody from the influence of his native brethren, so I attempted, instead,
to educate him with respect to the confusing political structure he'd be
facing. To Cody's worried mother, I simply promised to look out for him,
and to continue our adherence to the Word of God.

43.    During this time, Cody and I worked diligently in developing a program
we titled "Change the Game". This was a program designed to help foster a
change in the way individuals served their time. Cody and I opined, that
by implementing a cohesive workout regiment, and by providing numerous avenues
with which Offenders could relate on a cerebral level, doing so would
alleviate many of the stresses with which Inmates are so commonly afflicted.
I was hopeful, as was Cody, that our program might eventually become part
of the DOC's educational curriculum, and we dedicated countless hours to
its development.

44.    Although the Natives didn't like the relationship between Cody and
myself, I believed they had, to a point, been willing to tolerate its existence.
However, behind the scenes, a plan was taking shape that would effectively
cut short my friendship with Cody Allen. In fact, Cody's friends, those with
whom his mother believed he should align himself, began to systematically
turn him against me.

45.    As it were, the need to separate Cody Allen from me was ostensible,
in-that doing so would prove the cornerstone of a much larger plan. A plan
in which the Native faction, in conjunction with members of the Gangster
Disciples; led by Mathew Holt; would plot to have me killed [by] the very-
expendable Cody Allen.

ADDENDUM TO DECLARATION: GREEN - 9

46

46.     On 10/22/2015, after our daily workout, Cody Allen informed me that during the Native drumming circle, he was instructed to cease his association with me. Cody stated that while he adamantly opposed this decision, it had come from the Native "Elders," and therefore was not open to debate. Also, Cody stated that I should "watch my back." He noted that Mathew Holt had infiltrated the Native "Car," and that his end goal was to see me harmed.

47.     That same day, I was remanded to Administrative Segregation (for the second time) in regard to Mathew Holt's prior unfounded PREA allegations. It was during this absence from Mainline that the Native faction began barraging Cody Allen with depraved delineations, in which I was assigned the role of predator, not friend.

48.     It is important to note, that although Cody Allen had been ordered to cease his association with me; he, upon learning of my being remanded to AD SEG, had immediately contacted his mother, Kimberly Betty, and requested she contact me via e-mail, and make sure I was "OK." This is evident by e-mail marked as Exhibit:

49.     Additionally, while in AD SEG, I shared numerous phone conversations with Kimberly Betty, in which she repeatedly noted her desire that Cody and I remain in contact through third party means—and that she would happily facilitate such contact. As is evident by phone records marked as Exhibit:

50.     During this time I received word that I would be "Hit," that it was to take place upon my return to Mainline, and that very possibly, it would come at the hands of Cody Allen.

51.     I was aware, through my conversation with Kimberly Betty, that Cody's Native overseers had been inculcating him with falsehoods regarding my character. However, Ms. Betty swore (repeatedly) that Cody would never cause

47

me harm. In fact, Ms. Betty was emphatic that Cody was actively seeking to

prevent my assault. As is evident by phone records marked as Exhibit:

52.   Shortly after my release to Mainline, 11/17/2015, I contacted Kimberly

Betty by e-mail, and thanked her for the care and support she exhibited

during my time in AD SEG. As is evident by e-mail marked as Exhibit:

53.   In that same e-mail, I spoke of my regret that Cody and I could no

longer associate, and that race relations (in prison) being what they are,

I understood he had to follow the directives of those above him, I was

specific in-that I was not at all angry with Cody; that I loved and respected

him; and the I would continue to pray for him everyday. As is evident by

e-mail marked as Exhibit:

54.   In her reply, Kimberly Betty alludes to her son making choices "for

the greater good," and that she supports all positive decisions he makes

for himself. Ms. Betty notes that because I am a "smart person," she is sure

I can understand and respect [this]. Clearly, the (choice) Cody has made

for the "greater good," was the sacrificing of our friendship—in the hopes

that (no) violence would befall me. As is evident by e-mail marked as

Exhibit:

55.   On 11/26/2015, I sent an e-mail to Frederick Simms; Mr. Simms is my

cousin, and will often facilitate third party contact for me through e-mail

correspondence. This particular e-mail was intended for Cody Allen, and was

sent a mere two hours prior to my being assaulted.              As is

evident by e-mail marked as Exhibit:

56.   At the time, I was aware that Cody had been existing in a state of

distress, and though I wished I could approach him and provide a scant bit

of comfort, I knew doing so would only cause him problems. As it were, there

ADDENDUM TO DECLARATION: GREEN - 11

48

had been ostensible tension between myself and members of the Native faction.
Consequently, I knew the Natives had aligned with the Gangster Disciples,
and that Mathew Holt had subsequently elicited their assistance in seeing
me harmed.

57.    However, because I knew Cody well, I discerned he was wrestling with
a vast conundrum, and I attempted to contact him that day (via e-mail) in
the hopes of providing words of encouragement, if not amelioration. It was
evident he was struggling with conflicting emotions, and because I thought
of Cody as my very own son, it broke my heart to see him in such obvious
distress. I believed that if I could contact him through e-mail, I might
help him to work through his angst. I wished to remind Cody to follow his
faith, and to seek answers through God's teachings. I suggested he focus
upon his capacity to love, and of his desire to exist peacfully. I reminded
Cody that he'd worked hard to become the Man he is, and that his emerging
principals were not a hindrance, but a gift from God. I felt Cody needed
to hear that despite the noise and rhetoric, he could still make decisions
that would well-reflect his code of ethics. As is evident by e-mail marked
as Exhibit:

58.    That Cody and I remained on good terms is evident by the tone, tenor,
and nature of our correspondence. Between us, there existed no animosities,
nor did there exist even an ounce of ill will. And while our dividing-chasm
was spawned from the misbegotten fears of the ignorant, Cody and I remained
kindred souls. The truth is, both Cody and myself wished only good things
for one another. Even today, I keep Cody in my prayers, and continue to hope
he finds success during, and beyond his incarceration.

49

59.    As I have served so many years in prison, I am well adroit of the politics taking place therein. Accordingly, because I am so practiced in navigating the hazards associated with Institutional life, I know that individuals are often compelled into committing actions they find abhorrent. This was true of Cody Allen, in-that were he not under threat of imminent physical harm, and had he not been so recently inundated with falsehoods concerning my character, he would never considered causing me harm.

60.    In fact, since the day of my being assaulted, and nearly killed at the hands of Cody Allen, I have received numerous messages from him in which he's begged my forgiveness. Cody maintains that he did everything he could to avoid assaulting me. However, because it was ordered that I be (murdered,) and not merely assaulted, Cody agreed to proceed with the "Hit." Cody knew he was capable of making a half-hearted, but good show of it, then simply walk away. Had he done otherwise; had he allowed another Inmate to facilitate my assault, I would now be dead. Period.


SIGNED this _27_ day of _Oct_ , 2017, at Walla Walla Washington.

_____
Deangelo A. Green, Plaintiff


ADDENDUM TO DECLARATION: GREEN - 13

50

Exhibit → Five



Department of
**Corrections**
WASHINGTON STATE

OFFENDER COPY

| LOG I.D. NUMBER |
|---|
| 15601096 |

**OFFENDER COMPLAINT**

CHECK ONE: ☐ Initial ☐ Emergency ☑ Appeal ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain what happened, when, where, and who was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:** Complaints must be filed within 20 working days of the incident. Appeals must be filed within 5 working days of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name | First | Middle | DOC Number | Facility/Office | Unit/Cell |
|---|---|---|---|---|---|
| Green | D'Angelo | A | 310589 | SCCC | FNB15 |

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS: STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|

**COMPLAINT:** I appeal, for I was assaulted 11/26/15 in the most active location in SCCC kitchen. There's cameras everywhere. I am sure those cameras witnessed me enter the chow hall with my glasses on. There was a crime scene which my glasses were part of the crime. I & I or the shift commander team have my glasses. The I my property officer told me my glasses were broken, cus of IMU said my glasses was broken plus a staff from that night stated my glasses are broken I'm trying to get my glasses in my possession so I could send them out. I have been wearing glasses for over 20 years. You won't never see me without glasses. Sgt Dickerson is on second shift, my assault took place on the third shift, plus Sgt Dickerson never witnessed me without glasses, I ask that you review the cameras, for I came in the chow hall with my personal glasses on I pray the cameras could see that, I ask that you contact I&I, cus in IMU, FM4 property officer, and the shift commander that night most of all, my property forms I had glasses on my face over 20 years.

**SUGGESTED REMEDY:**

Mandatory _D'Angelo Green_  1/19/16
Signature  Date

**GRIEVANCE COORDINATOR'S RESPONSE**
Your complaint is being returned because:
☐ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____
☐ Administratively Withdrawn _____
☑ The formal grievance/appeal paperwork is being prepared.

| Facility/Office SCCC | Date Received 1/21/16 |
|---|---|

☐ The complaint was resolved informally.
☐ Additional information and/or rewriting needed. (See below.)
  Return within 5 working days or by: _____
☐ No rewrite received _____
☐ Sent to _____ (facility) on _____ (date).

**EXPLANATION:** Level II  1/22/16

| Coordinator's Name (print) **D. Dahne CSIII** | Coordinator's Signature | Date |
|---|---|---|

DOC 05-165 Front (Rev. 04/01/14)   DOC 310.100, DOC 550.100

52

 Department of
# Corrections
WASHINGTON STATE

**NOTICE OF PREA INVESTIGATION FINDINGS**

Date: 11-9-15

Offender Name: Green, Deangelo 310589                     Case Number: 15-13962

This is to serve as notification that the investigation of the PREA allegation has been closed.  The Appointing Authority
has determined that the allegation was:

☒   Unfounded -              No further action will be taken at this time unless a 549 infraction is warranted.

☐   Unsubstantiated -        No further action will be taken at this time.

☒   Substantiated -          An infraction will be written, and the disciplinary process will be initiated.

☐   Substantiated -          An infraction will not be written due to offender status (i.e., community supervision, mitigating
                             circumstances, release).

If you have any questions regarding this investigation, please contact    Investigator 3 Gleason

If you do not wish to keep this notice, forward it to the Correctional Unit Supervisor/Community Corrections Supervisor.

The contents of this document may be eligible for public disclosure.  Social Security Numbers are considered confidential information and
will be redacted in the event of such a request.  This form is governed by Executive Order 00-03, RCW 42.56, and RCW 40.14.

Distribution: ORIGINAL - Offender                                            DOC 490.860
DOC 02-400 (Rev. 07/14/15)

SCCC

Department of
Corrections
WASHINGTON STATE

**PHOTO BACKER**

Incident: __Assault__   Date Occurred: __11/26/2015__   Time Occurred: __1825__

Location of Incident: __B side Dinning__   Incident Number: _____

Subject of Photo: __Green, Deangelo__

Victim: __Green, Deangelo__   DOC Number: __310589__

Suspect: __Allen, Codie__   DOC Number: __379214__

Date of Photo: __11/26/2015__   Location of Photo Taken: __Lower Medication__

Photo Taken By: __Officer E. Pearson__   Photo Number: __2__   Of __11__
Full Name

(INSERT SINGLE PHOTO IN FRAME)



DOC 21-042 (Rev. 09/08/14)   DOC 420.375

54

(WADI)

A DO1-1L



Department of
**Corrections**
WASHINGTON STATE

| LOG I.D. NUMBER/*NUM. DE REGISTRO* |
| --- |
| 15599784 |

**APPEAL TO LEVEL III**
*APELACIÓN AL 3ER NIVEL*

| Name:<br>*Nombre:* | Last<br>*Apellido*<br>Green | First<br>*Nombre*<br>D'Angelo | Middle<br>*2do Nombre* | DOC Number<br>*Número DOC*<br>310589 | Facility/Office<br>*Institución/Oficina*<br>~~SCCC~~ | Unit/Cell<br>*Unidad/Celda*<br>~~CRCC~~ |
| --- | --- | --- | --- | --- | --- | --- |

| PART A - APPEAL TO LEVEL III<br>*PARTE A - APELACIÓN 3ER NIVEL* | Date Typed / *Fecha escrita a mano*<br>2/22/16 | Due Date / *Fecha de vencimiento*<br>3/21/16 |
| --- | --- | --- |

**I WANT TO GRIEVE /** *QUIERO QUEJARME DE*: I appeal, if my Level 1 and 2 grievances were investigated by you, Lt. Casey and reviewed by Associate Van Ogle, that means each person reviewed the cameras on 11-26-15 in B-side dining? Each person reviewed everything written about my incident and each person listed to all the radio messages on that night? In order for the officers to call for help 11-26-15 in B-side dining, that means they witnessed someone assaulting me? Didn't the officers call for help labeling my assault as a fight? This means the incoming officers to the kitchen and the G-unit officers addressed their help call as a fight. That's unprofessional I called, allowing my attacker to escape the scene and to hide his weapon. If the officer saw me being assaulted, the wouldn't let my attacker escape the scene? Didn't the officers rely on intell from the inmates and the cameras after they found my bloody body? Nor would the officers need to do hand checks in the kitchen with the rest of the inmates inside the kitchen as they left that night. Since my assault investigation is finished, that means officers at SCCC lost their jobs? Every DOC (staff) raised their hand under oath to protect every inmate, yet on 11-26-15 in B-side dining, the officers cared less about my life, plus other officers didn't respect the integrity of that crime scene. The officers who escorted me to the outside hospital told the Shift Lt. that a weapon was used on me on the phone while watching me being stitched up. If the officers that night on 11-26-15 were alert, skilled, in the right locations, and those cameras were in the right position, my attacker would have got caught on the scene with the weapon he used on me that night. Most of all, he would have had received a criminal charge. I received straight cuts, 3cm to 5cm, 2cm to 2m to 5, 3cm to 5. No fist can do that damage.

**SUGGESTED REMEDY /** *REMEDIO SUGERIDO*:

| /s/ D. Dahne | 2/19/16 | /s/ D'Angelo Green | 2/19/16 |
| --- | --- | --- | --- |
| Grievance Coordinator Signature<br>*Firma del Coordinador de quejas* | Date<br>*Fecha* | Grievant Signature<br>*Firma del agraviado* | Date<br>*Fecha* |

**PART B - LEVEL III RESPONSE/***PARTE B - RESPUESTA 3ER NIVEL*

I reviewed your initial grievance as well as all appeals and responses.

DOC Manager, Tim Thrasher, also reviewed this grievance and provided this response:

I reviewed your Level I and II grievance, the investigation, and the responses. I have read your Level III appeal. A complete investigation was conducted not only into your allegation, but also the incident where you were assaulted.

I concur with the Level II response. The situation was reviewed and any improvements/adjustments that were identified have been implemented. During the course of the investigation no weapon was recovered. In any grievance situation if any staff discipline did occur as a result of this incident/investigation information is not shared with offenders. One of the main goals of the department is to provide as safe as an environment as possible to offenders and staff, unfortunately at times situations like this occur.

| | 3/18/16 |
| --- | --- |
| Assistant Secretary/Deputy Director/designee<br>*Subsecretario/designado*          Robert Herzog | Date<br>*Fecha* |

Distribution: Grievance Program Manager/*Gerente del Programa de Quejas*, Grievance Coordinator/*Coordinador de Queja*, Grievant/*Quejante*
DOC 05-169 E/S (Rev. 04/01/14)                                                    DOC 550.100

55

Department of
**Corrections**
WASHINGTON STATE

LOG I.D. NUMBER
15593376

**OFFENDER COMPLAINT**

CONFIDENTIAL

CHECK ONE:  ☑ Initial   ☐ Emergency   ☐ Appeal   ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain what happened, when, where, and who was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:** Complaints must be filed within 20 working days of the incident. Appeals must be filed within 5 working days of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name | First | Middle | DOC Number | Facility/Office | Unit |
|---|---|---|---|---|---|
| Green | D'Angelo | A | 310589 | SCCC | GD 28 |

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS: STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|

COMPLAINT: I want to grieve them PREA claims on 8/1/2015 20:30 Against me. I was Targeted behind Matthew Holt #341901 mental problems and I was put into a compromising position that Resulted in me being taken to seg for slanderous allegations that proved to be false and malicious. MR Holt mental let downs, lieing nature and false Rape claim were known by the higher officals in the D.O.C. Futhermore, the tragedy that took place in MR Holt young days along with his sexuality are logged as well. When MR Holt made them PREA claims on 8/1/15. I feel like the staffs shouldn't believed them based on all them facts. This situation caused me severe trauma mentally. I was not prepared for any of these actions. I was so unstable that I was placed on a suicide watch for four days. I have been fighting mentally since I been Released back to population. I will be getting back on my pills soon. I will be o.k. until than.

SUGGESTED REMEDY: I would had took them PREA claims to my grave yard. PREA procedures should be changed. Guys are misusing this PREA Just to get other inmates locked up. There should be major punishments. Mandatory

Signature: D'Angelo Green          Date: 8/23/15

| GRIEVANCE COORDINATOR'S RESPONSE | Facility/Office | Date Received |
|---|---|---|
| Your complaint is being returned because: | SCCC | 8/26/15 |

Your complaint is being returned because:
☐ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____
☐ Administratively Withdrawn
☐ The formal grievance/appeal paperwork is being prepared.

☑ The complaint was resolved informally.
☑ Additional information and/or rewriting needed. (See below.)
    Return within 5 working days or by: _____
☐ No rewrite received _____
☐ Sent to _____ (facility) on _____ (date).

EXPLANATION:    Forward to PREA Unit

| Coordinator's Name (print) | Coordinator's Signature | Date |
|---|---|---|
| D. Dahne CSII | | |

DOC 05-165 Front (Rev. 04/01/14)                    DOC 310.100, DOC 550.100

56

LOG I.D. NUMBER/NUM. DE
**15599784**



Department of
**Corrections**
WASHINGTON STATE

OFFENDER COPY

**LEVEL I - INITIAL GRIEVANCE**
*NIVEL 1 - QUEJA INICIAL*

| Name:<br>*NOMBRE:* | Last<br>*APELLIDO*<br>**Green** | First<br>*PRIMERO NOMBRE*<br>**D'Angelo** | Middle<br>*2DO NOMBRE* | DOC Number<br>*NUMERO DOC*<br>**310589** | Facility/Office<br>*FACILIDAD*<br>**SCCC** | Unit/Cell<br>*UNIDAD/CELDA*<br>**FNB15** |
|---|---|---|---|---|---|---|

**PART A - INITIAL GRIEVANCE/*PARTE A - QUEJA INICIAL***   Date Typed   12-14-15   Date Due

**I WANT TO GRIEVE / *QUIERO QUEJARME DE*:** On 11-25-15 during Thanksgiving dinner time in SCCC chow hall, I could have lost my life but instead I suffered a list of injuries for I was assaulted while exiting the chow hall on that date. My face was sliced up to include my top left eye, left cheek, left ear and my top lip. These wounds didn't come from me falling, a kick nor a punch because if so, those areas would have been fat or at least broken. My slices came from a weapon. The outside doctor who put stitches in my face, the escorted staffs, my self-knowledge to these wounds and from the incoming inmates in IMU that were present that night confirm these facts. Due to known lack of security, mainly positioning of staff and cameras, someone performed a deadly assault on me and they got away afterward. Who's to say the inmate didn't have a weapon, body movement tells it all that night. Within the last month, inmates have been witnessing the lack of security, relaxedness and unprofessional matters in the SCCC chow hall so they have been executing their attacks there.

**SUGGESTED REMEDY / *REMEDIO SUGERIDO*:** I am asking and seeking payment for my damage physically and mentally. Log ID No. 15599784.

| /s/ D. Dahne | 12-14-15 | /s/ D'Angelo Green | 12-14-15 |
|---|---|---|---|
| Grievance Coordinator Signature<br>*FIRMA DE COORDINADOR DE QUEJAS* | Date<br>*FECHA* | Grievant Signature<br>*FIRMA DE QUEJANTE* | Date<br>*FECHA* |

**PART B - LEVEL I RESPONSE / *PARTE B RESPUESTA PRIMER NIVEL***

Your complaint has been investigated and it has been concluded that although the investigation is ongoing there was no known lack of security. This incident is still under investigation and upon conclusion involved parties will appropriately be held accountable.
The grievance process does not have the authority to reward monetary compensation nor is it the appropriate venue in which to seek such. Your suggested remedy will not be considered and no further action is recommended at this time.

| D Dahne | 12/14/15 |
|---|---|
| Grievance Coordinator Signature<br>*COORDINADOR DE QUEJAS* | Date<br>*FECHA* |

You may appeal this response by submitting a written appeal to the Coordinator within five (5) working days from date this response was received.
*Ud. puede apelar esta respuesta al someter una apelación por escrito al coordinador dentro de cinco (5) días de trabajo de la fecha en que esta respuesta fue recibida.*

witness or not
it was called a

57

EXhibit → thREE

| DATE | SYMPTONS, DIAGNOSIS, TREATMENT, TREATING ORGANIZATION (Sign each entry) |
|---|---|
| 4/5/02 0840 | **MENTAL HEALTH CLINIC** per Telepsych c̄ Dr H. Davis |
| | Pt here. informed consent obtained — MMcCloud LVN |
| 4/5/02 1430 | Telepsych Recommendations rec'd + 1/o per Dr R Bouchat |
| | ① Cont. Trazadone 100mg q̄ hs X 30d |
| | ② RTC in 30d |
| | 1/o R Bouchat MD     R. BOUCHAT MD   Bouchat md |
| | Noted     MMcCloud     M. McCLOUD, LVN |
| 4-26-02 1000 | Admin note. |
| | In received glasses and a soft eyeglasses case in good conditions.     M. OTERO CLERK II |
| 5 1 2 | **MENTAL HEALTH CLINIC** |
| 1143 | S: c/o anxiety & fear for personal safety since stabbing incident (vs patient) at previous facility. Pt adamant that he needs a single cell, stating that he is prone, in his present state to strike out again to someone. |
| | O: highly irritable, impatient, condescending, verbose, speech pressured, dysphoric, querulous; pt states he is now writing a book, but he is not overtly delusional. no hint of voices nor of self-injurious leanings Pt may be hypervigilant wrt prior stabbing, but frank paranoia was not noted. |
| | A: Anxiety Disorder (vs PTSD vs Bipolar). Pt insists on continuing with Trazadone/doxepin. He states that "something was wrong in my family — I know there was an attitude problem with us" & pt may well have bipolar dis. At this time however, he is in no mood to discuss alternative medication, & I will honor his request for ↑d doxepin/~~trazadone~~. P: ↑ doxepin, 150 mg PM, x 30d, ret 2 - trazadone. RTC in 3 mo.     R. BOUCHAT MD   Bouchat |

```
RUN DATE: 11/26/15          Grays Harbor Comm Hosp EDM **LIVE**              PAGE 4
RUN TIME: 2214                    ED Patient Summary
RUN USER: EWILLIAMS
```

```
 atient:  GREEN,DEANGELO A              Acct No.:  G018613505      Unit No.: M0212190
 ─D Physician:  PICKERING,ELIZABETH A    Age/sex:  40/M                 Loc: ER
 Chief Cmplnt:  Assaulted                 Status:  REG ER
```

| Ordered | Medication | | Provider |
|---|---|---|---|
| 11/26/15 1947 | BACITRACIN Use Qty needed PACKET T/ONE/ONE | | PICEL |
| | Use Qty needed | | |
| 11/26/15 2002 | LIDOCAINE/EPINEPHRINE/TETRACAI 2 ML SYRINGE T/ONE/ONE | | PICEL |

Medication

```
            Sch Date-Time  Ordered Dose  Admin Dose
            Doc Date-Time  Given - Reason          Site      User
            Override Comment
```

BACITRACIN 0.9 GRAM PACKET (Bacitracin Zinc) T/ONE/ONE
```
            11/26/15-1950  None          1 GRAM
            11/26/15-2028  Y                       O         WHISENHUNT,ROY H    , RN
            FACE
```

LIDOCAINE/EPINEPHRINE/TETRACAINE GEL 2 ML SYR (Lets Kit) T/ONE/ONE
```
            11/26/15-2005  2 ML          2 ML
            11/26/15-2024  Y                       O         WHISENHUNT,ROY H    , RN
            FACE
```

## Visit Prescriptions

| Prescriptions/Reported Meds | Type | Issued | Provider | Last Edited |
|---|---|---|---|---|
| HYDROCODONE/ACETAMINOPHEN (Norco 5-325 Tablet)  1 EACH TABLET | Rx | 11/26/15 | PICEL | 11/26/15 |
| 1 TAB PO Every 6 hours if needed As needed for PAIN, #7 TABLET   REF 0 | | | | |

## Departure Information

Primary Impression:
 Concussion
Secondary Impressions:
 Facial trauma
 Alleged assault
 Laceration of face, multiple sites
Disposition: HOME/SELF CARE                    Departure Date/Time:  -
Comment:
Condition: Stable

Referrals:

Pt Instructions: Where should I go for care?, myGHCares Patient Portal, Suture Care (ED)
Laceration (ED), Concussion (ED)

Additional Instructions:
 Keep wound dry for 24-48 hours, apply over-the-counter antibiotic ointment to
 the wound twice a day with dressing changes for the next 2-3 days
 If you develop increased redness, swelling, pain, pus, foul odors or red streaks
 return to the ER immediately
 Sutures should be removed in [5-7] days
 Tylenol [500] mg and ibuprofen[600] mg every 6 hours as needed for pain
 Follow-up with your provider this next week for recheck
 Return to the ER for any worsening symptoms
 Wake the patient every 3 hours tonight to make certain they respond

COPY



**DISCIPLINARY HEARING MINUTES AND FINDINGS**
(Continuation Sheet)

| Offender Name (Last , First) | DOC Number | Date of Hearing | | |
|---|---|---|---|---|
| Allen Codie | 379214 | 17 Dec 2015 | | |
| | | | Page      of | |

On 17 Dec 15, I reviewed the DVD video evidence that was provided to the Hearing Department as evidence in IGN 5 for Offender Allen 379214, for WAC rule violation 633. Here is the timeline I observed:

26 Nov 15:

18:27:19 – An offender, later identified as offender Allen 379214, can be getting up from his assigned seat and walking without a serving tray to the return serving tray line. Another offender, later identified as offender Green 310589, can be seen placing his serving tray on the return table and walking out of the dining hall. Allen is walking fast in an attempt to catch up with Green.

18:27:34 – As Green is attempting to exit the chow hall, Allen catches up to him, grabs him by the right arm and starts throwing close fisted punches at Green. Green can be seen going to the floor. Moments later he is on the floor and all the can be seen is Allen throwing close fisted punches with both hands at Green.

18:27:40 – Allen stops hitting Green, he stands up and walks out the dining hall. Staff arrive at the spot where Green is now on the floor.

18:28:28 – Offender Allen is seen entering the front foyer in G unit. When the film is slowed down: blood can be seen on his knuckles.
--- End of statement ---
CS3 Thomas L'Heureux

Distribution: ORIGINAL – Imaging System/Central File      COPY - Hearing Officer, Offender
DOC 21-312A (Rev. 10/31/13)
Scan Code IF01

DOC 320.150, DOC 460.000

6 61



Department of
**Corrections**
WASHINGTON STATE

OFFENDER I.D. DATA: **GREEN, DEANGELO ANTONIO**
(Name, DOC#, DOB)  **310589**

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY | UNIT |
|------|------|----------|------|
| 08/07/2015 | 10:30 | SCCC | F-UNIT |

**Allergies:**  ☐ Allergies verified with patient (Update Problem List and CIPS if needed)
None known

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**
Offender Green was seen in no contact because he was very stressed and wanted to talk about how he was being charged with PREA. He was very upset how this occurred and wanted to clear his name. We reviewed possible ways he could have done things that would not have result in him being sent to AS. He noted that he had developed a pattern that resulted in him being taken advantage of.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders)
301.9 Personality Disorder NOS

☐ Risks/benefits of recommended intervention explained; patient consents

Name and Title of Signatory/Reporting Provider:
J. LUADZERS, Ph.D.
LMHC., PSYCH. ASSOC.

Signature:

Page 1 of 1

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 410.430   DOC 420.250   DOC 490.850   DOC 610.010   DOC 610.040
DOC 610.025   DOC 610.600   DOC 610.650   DOC 630.520   DOC 670.020

62

DOC 13-435FP (11/20/2014)

OUTPATIENT/MENTAL HEALTH



**Department of**
**Corrections**
WASHINGTON STATE

OFFENDER I.D. DATA:  **Green, DeAngelo**

(Name, DOC#, DOB)   **310589**

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY | UNIT |
|------|------|----------|------|
| 10-22-2015 | 15:30 | SCCC | COU |

| Allergies: | ☐ Allergies verified with patient (Update Problem List and CIPS if needed) |
|------------|-----------------------------------------------------------------------------|

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**

S: Mr. Green was placed in COA on full restrictions due to threatening suicide. His plan is by any means and availability. Medical chart review notes history of suicide attempts and previous placement in the COA on 8/14/2015. He stated adamantly if given the chance he will kill himself.

O. Alert and oriented X4. Appropriate eye contact. Affect was angry and irritable. Mood was anxious with rapid thoughts. Volume and rate of speech were rapid, pressured, and loud. Mr. Green did not appear paranoid, delusional, odd/bizarre or reacting to internal stimuli throughout the meeting.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders)

A: Diagnosis: 301.7 (F60.2) Antisocial Personality Disorder

P: Mr. Green will be followed up on 10/23/2015 for further observation and assessment of suicidality.

☒ Risks/benefits of recommended intervention explained; patient consents

| Name and Title of Staff Performing Encounter: | Signature: |
|-----------------------------------------------|------------|
| Joshua Fields, MA, Psych Associate | JOSHUA FIELDS, MA<br>PSYCH. ASSOCIATE |

Page 1 of 1

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 410.430   DOC 420.250   DOC 490.850   DOC 610.010   DOC 610.040
DOC 610.025   DOC 610.600   DOC 610.650   DOC 630.520   DOC 670.020

63

DOC 13-435FP (11/20/2014)

OUTPATIENT/MENTAL HEALTH

STAFFORD CREEK CORRECTIONS CENTER
INITIAL PSYCHIATRIC ASSESSMENT

NAME:   Green, Deangelo
DOC#:   310589
DOB:
DATE:   12/10/2015

This is a psychiatric/psychological report providing information for DOC classification staff, community corrections officers, DOC Risk Management Specialists, the Indeterminate Sentence Review Board, and care providers within DOC who have a need to know.  Disclosure and dissemination of this report shall be in accordance with RCW 70.02 and DOC Policy 640.020.  It shall not be released to individuals outside DOC without the offender's consent or unless otherwise authorized by law.   The offender was advised of the purpose of the evaluation and departmental policy regarding information practices.

**This health care information is expected to be used by classification and other staff who have a legitimate need to know it to effectively manage the offender within the Department of Corrections.  This report is replicated in the offender's health record.**

**HPI:** Patient is in IMU.  Chart review reveals the patient is a 40-year-old African-American man incarcerated since 1993 with a current ERD of 2049.  He is familiar to me from evaluation here 4 years ago.  He has a primary chart diagnosis of mixed personality disorder.

Patient was assaulted on Thanksgiving Day sustaining several lacerations to his face with TBI sufficient to cause brief LOC.  Patient was subsequently evaluated at GHCH including CT scan without contrast which revealed no fractures or intracranial abnormalities.  Laboratory data from May reveal normal chemistries except for borderline elevated creatinine with triglycerides at 168 and negative syphilis, HIV and hepatitis screening.

Today, patient reports that he is usually up at 0900 and will write before lunch.  He has been reading in the afternoon after deciding to postpone his usual exercise for 2 weeks post-injury.  He does have dinner typically retiring between 22 – 2300.  He awakens occasionally at night and does have difficulty returning to sleep when this occurs.  His appetite has been stable.  He reports anxious ruminations regarding his safety and this would be understandable given his history of transferring amongst institutions to maintain his safety.  Patient has been in communication with intelligence and investigations staff.

**MENTAL STATUS EXAM:** is notable for neat grooming and attire with normal psychomotor behavior and a mildly constricted and anxious affect.  His thought processes are digressive but redirectable.  He does not report any current suicidal/assaultive ideation, organized paranoia or perceptual abnormalities.  Mood is mildly constricted and anxious appropriate to circumstances.

Current primary chart diagnosis is unchanged.

Supportive psychotherapy and psychoeducation were provided.  Patient has a history of seeking short-term benzodiazepine administration generally expressing ambivalence regarding sustained psychotropic prescriptions.  Recommendations were made for cognitive/behavioral strategies to help with his anxious ruminations and disrupted sleep.

Patient is convinced that the physical assault upon him was a "hit".

Return appointment is requested in 3 - 4 weeks should he remain here.  It is possible that he will be transferred to a different institution.

Michael Furst, M.D.
Psychiatrist

MF/ks
T: 12/16/2015

64



**Department of**
## Corrections
WASHINGTON STATE

OFFENDER I.D. DATA: **GREEN, DEANGELO**
(Name, DOC#, DOB)   **310589**

## PRIMARY ENCOUNTER REPORT

| DATE 08/27/2015 | TIME 10:00 | FACILITY SCCC | UNIT G |
|---|---|---|---|

**Allergies:**   ☐ Allergies verified with patient (Update Problem List and CIPS if needed)
(none reported)

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**

Mr. Green was scheduled following his release from close observation in the IPU. He reported that he has experienced stress due to recent PREA allegations. He has concerns about being labeled by other inmates. He has focused on keeping a low profile, exercising frequently, and avoiding problems with others.

Mr. Green described his mood as "up and down." He sleeps for five or six hours per night, which is adequate for him. His appetite is variable and his energy level is higher. He denied current suicidal ideation. He explained that he had become very frustrated by his placement in administrative segregation and thought he might cut himself with a razor.

When asked about anxiety, Mr. Green noted some worries secondary to his informant activities with I & I. He added that he may be relocated at some point in the future. He denied having acute mental health issues at this time, and did not feel he needed ongoing mental health treatment.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders)
Diagnosis: none; Rule Out Personality Disorder

S-Code: S1

Plan: Provide additional services as needed or requested

☐ Risks/benefits of recommended intervention explained; patient consents

| Name and Title of Staff Performing Encounter: Ryan D. Donahue, Ph.D., Psychologist 3 | Signature: _Ryan D. Donahue, Ph. D_ |
|---|---|

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 410.430   DOC 420.250   DOC 490.850   DOC 610.010   DOC 610.040
DOC 610.025   DOC 610.600   DOC 610.650   DOC 630.520   DOC 670.020

65

DOC 13-435FP (11/20/2014)

OUTPATIENT/MENTAL HEALTH



Department of
**Corrections**
WASHINGTON STATE

OFFENDER I.D. DATA: **Green, Deangelo**
310589

## MENTAL HEALTH NOTE:

Date of Encounter: 02/12/2016

Facility/Unit:   Coyote Ridge Corrections
Center - MSC

S: Mr. Green was assessed by me this morning as he was in observation. I conducted a 13-371 suicide assessment. Mr. Green eventually admitted that he had claimed he was suicidal and was going to hurt himself because he was under a lot of distress and did not want to get infracted for refusing his cell assignment. He also admitted to claiming that he wanted to hurt or kill himself to stay out of general population because he fears for his life. I educated Mr. Green on proper protocol and steps to take to report issues related to his safety. He understands that those issues go to I&I and other custody personnel to help verify protective custody needs or issues. I encouraged him to continue working through those channels and to not utilize mental health as an escape goat to programming. I encouraged him to refuse his cell assignment and take infraction at his choice as opposed feigning suicidal or self-harm intent to get out of a scary situations. Mr. Green acknowledged this. He admitted to this and stated that he would refrain from utilizing mental health in this way again. As a safety precaution, I had him sign an agreement, a safety plan stating that he would seek out mental health if he truly did become suicidal. Mr. Green adamantly denied that he had any intent, plan, desire or thought to harm himself in any way, including take his life.

O: Mr. Green was oriented x4. He gave direct eye contact. I spoke to him through the class as he stayed in observation. He failed to convince me that his symptoms are authentic. He did not appear to be responding to internal stimuli. He had a tendency to skirt the issues and not respond to the things that I asked him to answer. I got the direct sense that he was trying to manipulate or trying to tailor the conversation very craftily for his personal again. Later, when I pointed this out and made it overt, he admitted to it. He, at times during the interview, became anxious, especially during the times that I made it overt that it appeared that he was manipulating the system. However, toward the end of the concession, we had a nice conversation. He appeared more calm and relaxed when he stated that he would no longer manipulate the system for his personal gain. He adamantly denies suicidal intent, plan thought, and desire.

A: No diagnosis other than personality disorder. He is stable and capable of going back to segregation to program. He stated that he would be able to do fine with that.

P: I will refer him for post suicide observation follow up with his primary therapist.

_____
Joseph Jenks, M.S. / LMFTA

2-18-16
DATE SIGNED

96926 /96696699
D:  Fri Feb 12 14:46:27 2016  EST
T:  Sun Feb 14 06:06:36 2016  EST

66

State law (RCW 70.02; RCW 70.24.105; RCW 71.05.390) and/or federal regulations (42 CFR Part 2; 45 CFR Part 164) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-435 (11/08/2013)

OUTPATIENT/INPATIENT